**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| **DANIEL DAKEM WILSON, JR.,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No. 15-3096 (ES)** |
| | : | |
| **v.** | : | **MEMORANDUM OPINION** |
| | : | |
| **COMMISSIONER OF SOCIAL SECURITY,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

SALAS, DISTRICT JUDGE

Daniel Dakem Wilson, Jr. ("Wilson") appeals a final decision of the Commissioner of Social Security that upheld an administrative law judge's (the "ALJ") decision denying Wilson's application for Supplemental Security Income ("SSI") under the Social Security Act. For the reasons below, the Court AFFIRMS the Commissioner's decision.[1]

## I.     Relevant Background

Because the Court writes primarily for the parties (who are familiar with the facts and procedural history of this matter), the Court addresses those facts bearing directly on the instant appeal in its discussion below.

## II.     The Standard of Review & the Commissioner's Five-Step Sequential Analysis

The well-settled standard of review set forth in the Third Circuit—which the Court employs herein—is undisputed in this matter. *See, e.g.*, 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

---

[1]     The Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b). The Court has subject matter jurisdiction over this matter under 42 U.S.C. §§ 405(g) and 1383(c)(3).

conclusive . . . ."); *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) ("Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It is less than a preponderance of the evidence but more than a mere scintilla. Overall, the substantial evidence standard is a deferential standard of review.") (quotation marks and citations omitted).[2]

Similarly, in the interests of brevity, the Court incorporates by reference the well-settled standard for a disability determination and the five-step sequential evaluation for disability claims set forth in detail elsewhere. *See, e.g.*, *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007); *Plummer v. Apfel*, 186 F.3d 422, 427-429 (3d Cir. 1999); *Sanchez v. Colvin*, No. 15-0415, 2015 WL 8780509, at *4-5 (D.N.J. Dec. 14, 2015), *aff'd sub nom*, 705 F. App'x 95 (3d Cir. 2017).[3]

## III.    Summary of the ALJ's Findings

Briefly, as the parties are aware, the ALJ determined the following regarding Wilson:

(1) Wilson has not engaged in substantial gainful activity since April 30, 2012—the date he filed his application for SSI (R. at 10, 12)[4];

(2) Wilson has the following severe impairments: "Asthma; a mood disorder; a history of learning disability, with borderline to low-average intellectual disability; and drug abuse, in reported remission" (R. at 12-13);

(3) Wilson "does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)" (R. at 13-14);

---

[2]    *See also Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (quotations marks and citation omitted); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) ("Neither the district court nor this court is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.") (citation omitted).

[3]    To be sure, however, the Court addresses below certain steps in its analysis of the issues presented on appeal.

[4]    Citations enumerated as "(R. __)" refer to the certified Administrative Record provided by the Commissioner pursuant to Local Civil Rule 9.1(c).

(4) Wilson "has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations. Specifically, [Wilson] should avoid concentrated exposure to irritants, fumes, dust, gases, and poor ventilation. Further, he would be limited to work involving unskilled tasks, in a low-stress job defined as having only occasional decision-making required, and only occasional changes in the work setting, with no fast-paced production or assembly line-type work. Lastly, he can only occasionally interact with the public and with co-workers" (*See* R. at 14-19);

(5) Wilson "has no past relevant work" (R. at 19);

(6) Wilson was born on January 5, 1991 and was 21 years old on the date he filed his SSI application (R. at 19);

(7) Wilson "has at least a high school education and is able to communicate in English" (R. at 19);

(8) "Transferability of job skills is not an issue because [Wilson] does not have past relevant work" (R. at 19);

(9) Considering Wilson's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform" (R. at 19-20)[5]; and

(10) Wilson "has not been under a disability, as defined in the Social Security Act, since April 30, 2012" (R. at 20).[6]

## IV.    Analysis

### a.    The ALJ's Step-Three Finding Is Not Beyond Judicial Review

For step three of the five-step sequential evaluation, Wilson contends that the ALJ failed to evaluate his "combination of impairments or psychiatric restrictions" and compare them to impairments listed by the Commissioner.   (*See* D.E. No. 13 at 23-26).   He states that the "combine and compare" requirement was "upheld" in *Torres v. Commissioner of Social Security*,

---

[5]        A vocational expert testified that an individual with Wilson's age, education, work experience, and residual functional capacity "would be able to perform the requirements of representative occupations such as: Bagger . . . ; Hand packer . . . ; and Sandwich maker."  (R. at 19-20).

[6]        The following individuals were involved in consultative examinations or state-agency assessments and are referenced in the Court's discussion: (1) Hongya Song, M.D. (consultative examination on August 31, 2012) (R. at 414-15); (2) Anthony Candela, Ph.D. (consultative examination on September 4, 2012) (R. at 417-18); Joan Trachtenberg, M.D. (stage-agency assessment on September 20, 2012) (*see* R. at 52-60); and Robert Eckardt, Ph.D. (stage-agency assessment on November 27, 2012) (*see* R. at 61-69).

279 F. App'x 149 (3d Cir. 2008). (*Id.* at 24-25).[7] Importantly, Wilson claims that the ALJ's step-three finding is therefore beyond judicial review—which appears to be the heart of his challenge concerning step three. (*See id.* at 23-26 (using subheading stating "THE STEP 3 FINDING IS BEYOND JUDICIAL REVIEW")).

"In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work." *Plummer*, 186 F.3d at 428 (citation omitted). Step three requires determining whether the claimant suffers from an impairment—or combination of impairments—that either meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Knepp v. Apfel*, 204 F.3d 78, 82 (3d Cir. 2000); *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999). Importantly, an "ALJ must provide a sufficient framework of reasoning for a court to conduct 'meaningful judicial review' of the ALJ's decision." *Poulos*, 474 F.3d at 93 (quoting *Burnett*, 220 F.3d at 119). But the Third Circuit "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." *Jones*, 364 F.3d at 504. "If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five." *Plummer*, 186 F.3d at 428.

The Court agrees with the Commissioner that the ALJ's step-three analysis is not deficient. The ALJ found that Wilson "does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)." (R. at 13-14). His step-three finding states explicitly which listings he was considering (i.e., Listings 3.02A, 3.03B,

---

[7]     In the *Torres* case that Wilson relies upon, the "ALJ's entire combination analysis consisted of one cursory paragraph"—which was deemed "conclusory and inadequate." *See* 279 F. App'x at 152 (finding that the ALJ "failed to combine [claimant's] many medical impairments and compare them to analogous Appendix 1 listings" and that "conclusory statements, like the one in this case, have been found to be 'beyond meaningful judicial review'") (quoting *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000)).

12.02, 12.04 and 12.09 (R. at 13-14)). Wilson's challenge does not appear to concern his asthma impairment, which relate to Listings 3.02A and 3.03B. (*See* D.E. No. 13 at 26). Rather, relevant to Wilson's challenge is that the ALJ found the "severity of [Wilson's] mental impairments, considered singly and in combination, do not meet or medically equal the Listings of 12.02 (Organic mental disorders), 12.04 (Affective disorders), and 12.09 (Substance addiction disorders)." (R. at 13). As the Commissioner aptly notes (*see* D.E. No. 14 at 17 n.4), Listings 12.02 and 12.04 both require Wilson to prove that certain requirements are met under either: (1) Paragraphs A *and* B or (2) Paragraph C. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.02, 12.04.[8] The ALJ determined that neither Paragraph B nor Paragraph C requirements were met after discussion of subjective and objective evidence—oftentimes noting the *absence* of relevant evidence. (*See* R. at 13-14).

"Paragraph B requires that a mental impairment result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." *Avilla*, 2016 WL 2930512, at *6.[9] Here, the ALJ explained how the evidence (or lack thereof) failed to support the requisite limitations for each category. (*See* R. at 13-14). The ALJ did so by discussing Wilson's reports to Dr. Candela, as well as testimony during the ALJ's hearing. (*See* R. at 13-14). Also incorporated in the ALJ's analysis is testing results from Dr. Candela, as well as records from a mental status examination from when he was incarcerated in March 2012. (*See* R. at 14). Based

---

[8]    *See also Avilla v. Colvin*, No. 15-2857, 2016 WL 2930512, at *5 (D.N.J. May 18, 2016) ("As to mental impairments, Appendix 1 contains three lists of criteria, known as Paragraphs A, B, and C. The claimant must either (1) satisfy paragraphs A and B; or (2) satisfy paragraph C.") (internal citation omitted).

[9]    "A marked limitation is one that is more than moderate, but less than extreme. Repeated and extended episodes of decompensation require at least three episodes within one year, or an average of once every four months, each lasting for at least two weeks." *Avilla*, 2016 WL 2930512, at *6.

on a review of this evidence, the ALJ determined that Wilson has *mild* restriction of activities of daily living, *moderate* difficulties in maintaining social functioning, and *moderate* difficulties in maintaining concentration, persistence, or pace. (*See* R. at 13-14). As to the decompensation criterion, the ALJ noted the absence of certain relevant evidence—namely inpatient hospitalization or emergency-room visits based on his psychiatric disorders. (R. at 14). And Dr. Trachtenberg and Dr. Eckardt both found that none of the first three criteria was anything more than "moderate" and there were no repeated episodes of decompensation to satisfy the fourth criterion. (R. at 56, 65). It is simply unclear why Wilson argues that the ALJ's "B criteria findings offer conclusions having nothing to do with the rationale specifically advanced as the basis for those conclusions." (*See* D.E. No. 13 at 26). As such, the Court considers this assertion undeveloped and unpersuasive, and finds that substantial evidence of record supports the finding that Paragraph B was not satisfied.[10]

In relevant part, Paragraph C requires: repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; *or* a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.02, 12.04. Regarding Paragraph C, Wilson argues that the "analysis relies on boilerplate, invention [sic] and ignoring the fact that [he] is totally dependent on his grandmother's sheltered environment and that he was overwhelmed at a McDonald's counter job after less than 3 weeks." (*Id.* at 26). The ALJ found that: "There is no medical evidence or testimony that [Wilson] has experienced any

---

[10] Accordingly, Wilson's complaint that the "A criteria of 12.02 and 12.04 are ignored" is of no moment. (*See* D.E. No. 13 at 26). *See Avilla*, 2016 WL 2930512, at *6 n.4 ("Because the first alternative requires a positive finding as to both paragraphs A & B, it was not necessary for the ALJ to consider the "A" criteria, and he did not.").

of these criteria." (R. at 14). Both Dr. Trachtenberg and Dr. Eckardt reached this conclusion: "Evidence does not establish the presence of 'C' criteria." (R. at 56-57, 65). Further, considering the record as a whole, the Court notes that Wilson's grandmother submitted a report—which the ALJ considered and cited—noting (among other things) that: Wilson could take care of his son; he had no problem with his own personal care; he could prepare his own meals on a regular basis; he could clean his room; he could do laundry once a week; he could go outside the home daily by himself; he could use public transportation; he could shop for himself; he could pay his own bills; and he could engage in hobbies such as reading, watching TV, and playing sports. (*See* R. at 18).[11] In fact, the ALJ noted that her report was "given great weigh in terms of assessing the severity of [Wilson's] psychiatric disorders, as [his] grandmother lives with him and has known him all his life." (R. at 18). Finally, it appears that Wilson asks this Court to impermissibly weigh evidence and reach a different conclusion by considering his experience working at McDonald's. *See, e.g.*, *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."). Accordingly, the Court fails to see how Wilson aforementioned assertion shows that substantial evidence is lacking relating to the ALJ's Paragraph C's finding.

Thus, the Court finds that the ALJ's decision does not deprive this Court of a meaningful review of how Wilson's impairments—singly or in combination—fail to meet the relevant listed impairments for purposes of a step-three determination. *Cf. Burnett*, 220 F.3d at 119 ("Because we have no way to review the ALJ's hopelessly inadequate step three ruling, we will vacate and remand the case for a discussion of the evidence and an explanation of reasoning supporting a

---

[11]   The ALJ recounted the grandmother's report in a section of his decision that appears separate from his analysis regarding step three in particular—but this is of no moment. *See Johnson v. Comm'r of Soc. Sec.*, 398 F. App'x 727, 734 (3d Cir. 2010) ("In *Jones v. Barnhart*, we clarified that '*Burnett* does not require the ALJ to use particular language or adhere to a particular format,' but only to 'ensure that there is sufficient development of the record and explanation of findings to permit meaningful review.'") (quoting 364 F.3d at 505).

determination that [the claimant's] 'severe' impairment does not meet or is not equivalent to a listed impairment.").[12]

Finally, although the thrust of Wilson's step-three challenge is that judicial review is not possible (as evident—if nothing else—from his subheading on page 23 of his brief noted above), he also asserts that "paragraph 12.05 is never considered in addition to 12.02 and 12.04." (D.E. No. 13 at 26). In this regard, he avers that the ALJ "purposely exploited a lost disability file, special education records and psychological evidence of [Wilson's] cognitive disorder to refuse authorization of replacement evidence in the form of IQ testing to determine the extent of [his] cognitive disorder." (*Id.*). Wilson's contention concerning Listing 12.05 appears inextricably intertwined with an evidentiary issue relating to IQ testing discussed, *infra*. Suffice it to say, however, that the Court is mindful that "applicable regulations indicate that it is within the realm of the ALJ's expertise to determine the closest applicable listed impairment, based on the medical evidence, when examining whether a claimant's impairments meet or equal a listed impairment"—and, furthermore, that "[p]utting the responsibility on the ALJ to identify the relevant listed impairment(s) is consistent with the nature of Social Security disability proceedings which are inquisitorial rather than adversarial and in which it is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Burnett*, 220 F.3d at 120 n.2 (internal quotation marks, alterations and citations omitted). For purposes of

---

[12] Wilson's challenge appears to be there is insufficient analysis for meaningful judicial review. To be sure, however, Wilson asserts that "[t]here is no combination of impairments at step 3, particularly plaintiff's psychiatric disorders of mood, learning and cognitive ability." (D.E. No. 13 at 13). But he fails to explain how the combination of his identified impairments meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 such that ALJ *erred* in his analysis. *Cf. Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x. 159, 162 (3d Cir. 2008) ("First and foremost, [the claimant] provides us with no citations to any record evidence demonstrating that her impairments are of Listing-level severity."). The Commissioner aptly notes as much in this appeal: "Nor did he identify which listed impairment his combined impairments allegedly satisfied . . . ." (*See* D.E. No. 14 at 17-18). Further, the Court notes that nowhere in Wilson's brief does he address the relevance of Listing 12.09 as to step three.

step three, however, the Court notes that Wilson's contentions relating to 12.05 assumes—without support as discussed *infra*—that this Listing is relevant and met here.

### b. Substantial Evidence Supports the ALJ's Residual Functional Capacity ("RFC") Finding & the ALJ's Hypothetical to the Vocational Expert ("VE") was not Deficient (Steps Four & Five)

"Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work." *Plummer*, 186 F.3d at 428 (citation omitted). A claimant's RFC is the most a she can do despite her limitations. 20 C.F.R. § 416.945(a)(1); *see also Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999). "In making a residual functional capacity determination, the ALJ must consider all evidence before him." *Burnett*, 220 F.3d at 121. "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Id.* "The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler*, 667 F.3d at 361. The ALJ's conclusions as to residual functional capacity are examined with the deference required of the substantial evidence standard of review. *Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002).[13]

Notably, "objections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself." *See Rutherford v. Barnhart*, 399 F.3d 546, 554 n.8 (3d Cir. 2005).[14] In any event, if a claimant satisfies step four (as here),

---

[13] *See also Holley v. Colvin*, 975 F. Supp. 2d 467, 483 (D.N.J. 2013) ("The inquiry is not whether there is some contrary evidence, but whether the determination is supported by substantial evidence. Plaintiff's listing of some omitted symptoms does not persuade this Court that the ALJ's residual functional capacity determination is not supported by substantial evidence."), *aff'd sub nom*, 590 F. App'x 167 (3d Cir. 2014).

[14] "That is, a claimant can frame a challenge to an ALJ's reliance on vocational expert testimony at step 5 in one of two ways: (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC assessment, or (2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not

"the burden then shifts to the Commissioner at step 5 to show that other jobs exist in significant numbers in the national economy that the claimant could perform." *Id.* at 551. "Advisory testimony from a vocational expert is often sought by the ALJ for that purpose, and factors to be considered include medical impairments, age, education, work experience and RFC." *Id.*[15] (internal citations omitted). An ALJ's conclusion at step five that a claimant retains the limited functional capacity to perform jobs existing in the workforce normally is "based in large measure on the testimony provided by the vocational expert." *Id.* at 553.

Such testimony "typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ": "The ALJ will normally ask the expert whether, given certain assumptions about the claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy." *Barnhart*, 312 F.3d at 120 (internal quotation marks and citation omitted). And, as here, a claimant may challenge "that such testimony cannot form the basis of a substantial evidence determination in [the claimant's] case because it was based on responses to hypothetical questions that did not adequately consider her physical limitations." *Id.* After all, a "hypothetical question posed to a vocational expert must reflect all of a claimant's impairments"—and "great specificity is required when an ALJ incorporates a claimant's mental or physical limitations into a hypothetical." *Ramirez v. Barnhart*, 372 F.3d 546, 554-55 (3d Cir. 2004) (cleaned up).

That said, the Third Circuit does "not require an ALJ to submit to the vocational expert every impairment *alleged* by a claimant." *Rutherford*, 399 F.3d at 554 (emphasis in original). Rather, "hypotheticals posed must accurately portray the claimant's impairments and that the

---

convey those limitations to the vocational expert." *Rutherford*, 399 F.3d at 554 n.8. "Challenges of the latter variety . . . are really best understood as challenges to the RFC assessment itself." *Id.*

[15] "'Other work' must consist of jobs that exist in significant numbers in the national economy that the claimant can perform given his age, education, past work experience, and residual functional capacity." *Burns*, 312 F.3d at 119.

expert must be given an opportunity to evaluate those impairments as contained in the record." *Id.* (internal quotation marks and citations omitted). In short, "the ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations.*" *Id.* (emphasis in original) (citation omitted).[16]

Here, as noted above, the ALJ found—"[a]fter careful consideration of the entire record"—that Wilson

> has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations. Specifically, [Wilson] should avoid concentrated exposure to irritants, fumes, dust, gases, and poor ventilation. Further, he would be limited to work involving unskilled tasks, in a low-stress job defined as having only occasional decision-making required, and only occasional changes in the work setting, with no fast-paced production or assembly line-type work. Lastly, he can only occasionally interact with the public and with co-workers.

(*See* R. at 14-19).[17] The Court agrees with the Commissioner that substantial evidence supports the ALJ's physical and mental RFC determination.

---

[16] So, when is a limitation credibly established? Limitations "that are medically supported and otherwise uncontroverted in the record" are credibly established. *See Rutherford*, 399 F.3d at 554. And if any such limitation is "not included in the hypothetical question posed to the expert," then "reliance on the expert's response" must be "preclude[d]." *Id.* To be sure, however, "[l]imitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible." *Id.* As such, an "ALJ can choose to credit portions of the existing evidence"—but he "cannot reject evidence for no reason or for the wrong reason." *Id.* (internal quotation marks and citations omitted). Conversely, "limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible." *Id.* In fact, an ALJ "should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it." *Id.* (citation omitted).

[17] The ALJ noted in his analysis for step three that the limitations he found "are not a residual functional capacity assessment[,] but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process." (R. at 14). He explained how the "mental residual functional capacity assessment used at steps 4 and 5 . . . requires a more detailed assessment." (R. at 14).

### i. Physical Functioning

Wilson states that his "asthma/pulmonary impairment is deemed only non-exertional." (D.E. No. 13 at 14). He asserts that "[t]here is no rationale for the decisional RFC that [Wilson] suffers no exertional limitation whatsoever on account of his asthma." (*Id.* at 23).

The ALJ stated that the "relevant medical evidence of record in this case is essentially minimal." (R. at 15). The ALJ recounted that—although Wilson "described a history of asthma since age 6"—he was never hospitalized, only had asthma attacks twice in four months, and used an inhaler to treat himself. (R. at 16). In an August 31, 2012 consultative examination, Dr. Song reported (among other things) that: Wilson "visited the emergency room because of asthma" in about 2006; he was "[a]lert, awake, and oriented in no acute distress"; his chest was "[c]lear to auscultation"; there was "[n]o wheezing or rhonchi"; his "[g]ait and stance were normal and [he] used no assistive devices"; and "[l]ifting, carrying, and bending are good." (R. at 414-15). Further, Wilson's radiology report—which used a technique of frontal and lateral views of his chest—states that his "lungs are clear" and "[n]o pleural abnormality is seen." (R. at 421). The report states that there is "NO EVIDENCE OF ACTIVE CHEST DISEASE." (*Id.*).

The ALJ noted that Wilson's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible" because "there are very limited abnormal clinical examination findings or diagnostic test results to show significant physical problems." (R. at 17). The ALJ also noted that Wilson's grandmother stated "that his asthma was very bad and getting worse," but accorded "[l]ess weight . . . to her assessment of his asthma." (R. at 18). This was because "she is not a medical source, and the fact that [Wilson] has required no physical intervention for his asthma and did not describe a frequent level of asthma attacks"—which "outweighs [the grandmother's] otherwise sincere believe that his

asthma is very bad."  (R. at 18).  Nevertheless, the ALJ concluded that, "based upon his history of asthma, some work-related limitation would appear to be appropriate"—which was, in fact, a "different conclusion" than that reached by the state-agency consultants (who concluded that Wilson "was deemed to have *no* severe physical impairment").  (R. at 18 (emphasis added)).

Wilson gives the Court no reason to doubt that, in determining his physical RFC, the ALJ failed to consider all the evidence in the record (including the medical and non-medical evidence)—and explained his rejection of certain pertinent evidence.  Accordingly, the Court finds that substantial evidence supports the ALJ's findings regarding Wilson's physical functioning.

### ii.  Mental Functioning

In relevant part for step three, the ALJ found that, "[w]ith regard to concentration, persistence or pace, [Wilson] has moderate difficulties."  (R. at 14).  Although not entirely clear, Wilson appears to argue—at least in part—that the ALJ's RFC determination is flawed in light of this step-three finding.  (*See* D.E. No. 13 at 22-23).  Further, Wilson avers that a vocational expert's "answers to the ALJ's questions may surely have been different had the actual, specific limitations, uncontradicted in the record, been conveyed verbatim as part of the ALJ's hypothetical."  (D.E. No. 13 at 21 (citing *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004)).  And he avers that, "because the ALJ failed to construct a hypothetical which reasonably conveyed the extent of [Wilson's] mental limitations, the [vocational expert's] answer to those hypotheticals cannot constitute substantial evidence to support the ALJ's step five denial of benefits."  (*Id.* at 22).

The mental RFC in this matter has been reproduced above, and the Court finds that it is supported by substantial evidence.  In his decision, the ALJ considered the following testimony

from Wilson: he lived with his grandmother; his two children did not live with him; he did not complete the 9th grade; he obtained a GED while in jail in 2010; he last smoked marijuana in 2011, and once had a seizure from use of Ecstasy; he has sleep problems; he just "sit[s] there" during the day, not watching television or talking to his grandmother; he has no friends; he can travel independently, but walks to places because he has no bus money; he was in special education due to a behavioral disorder and a learning disorder; he was depressed based on a history of abuse from his father and being informed by others that he was slow and did not comprehend things. (R. at 15).

As to "relevant medical evidence"—which "is essentially minimal"—the ALJ recounted a record involving hospital visits or admissions based on physical assaults, as well as an isolated episode of vomiting and dysphagia. (R. at 15). Diagnostic testing resulting from an overnight admission from a blunt assault revealed no acute pathology of the head and no neurological deficits. (R. at 15). During Wilson's incarceration, a December 29, 2011 treatment plan showed diagnoses of mood disorder and polysubstance abuse in remission, with a "Global Assessment of Function" score of 60 (which "is indicative of moderate symptoms, or moderate difficulty with social and/or occupational functioning"). (R. at 16). In a subsequent March 27, 2012 progress note, Wilson described feelings of stress and erratic sleep—but the mental status examination was essentially benign: although he had an anxious mood, his psychomotor behavior was normal, he was cooperative, he exhibited normal speech, and had a coherent thought process (without delusions, hallucinations, suicidal ideation or homicidal ideation). (R. at 16). Wilson's "Global Assessment of Function" score was increased to 65—which indicates "some mild symptoms (e.g., depressed mood and mild insomnia), or some difficulty in social and/or

occupational functioning, but otherwise represented an individual who was generally functioning pretty well." (R. at 16).

Dr. Song's August 31, 2012 consultative examination report shows that Wilson "presented with normal concentration and persistent memory, attention, and social interaction during the evaluation." (R. at 415).

Dr. Candela's September 4, 2012 mental status examination revealed no auditory or visual hallucinations, delusions, psychosis, or any formal thought disorder. (R. at 16). Further, Wilson denied panic attacks, phobic reaction, paranoid thinking or anhedonia symptoms. (R. at 16). He noted that he watched his son when his girlfriend was out. (R. at 16). Dr. Candela's report also indicates (among other things) that Wilson: "looked his stated age"; "made good eye contact"; "took to the testing situation quite well"; "dressed neatly, casually, and appropriately"; had thoughts that "were clear, connected and goal directed"; "spoke in full sentences"; "is depressed"; and "is functioning on the Borderline to Low Average Level of Intellectual Ability." (R. at 418-19).

Further, the ALJ considered Wilson's grandmother's report—notable because she lives with him and has known him all his life—that (among other things) Wilson could take care of his son, that he has no problems with his own personal care, he spent time with others on a daily basis, and his functioning is at an independent and sufficient level. (R. at 18). The other aspects of his grandmother's report noted above are most certainly relevant here.

Additionally, in his May 12, 2012 adult function report, Wilson reported (among other things) that: he takes care of his son; he denies having problems with personal care; he prepares his own meals daily; he cleans and does laundry (for household chores); he goes outside every day; his hobbies and interests including reading, watching television, basketball, and family

time; he spends time with others and he doesn't need to be accompanied by anyone else; he follows both written and verbal instructions "very good"; and he gets along with authority figures (including bosses) "very well." (*See* R. at 176-83). Regarding adversely affected abilities, Wilson checked "Lifting," "Walking," "Stair Climbing," "Bending," and "Standing"; he did *not* check "Completing Tasks," "Concentration," or "Following Instructions." (*See* R. at 180-81).

Wilson reported that his depression relates to his: inability to function because of asthma; incarceration; and getting frustrated easily. (R. at 16). Dr. Candela opined that Wilson "was functioning on the borderline to low average level of intellectual disability, with a depressed mood and constricted affect," rating his "Global Assessment of Function: score as 60—which was given "some weight" and "is consistent with a GAF of 60 given by [Wilson's] former treating psychiatric sources . . . in December 2011." (R. at 16, 17). The ALJ noted that, with respect to mental functioning, there is no active treatment after March 2012—with Wilson "deemed to be functioning at no worse than a moderate level of impairment as of the most recent psychiatric progress note of record." (R. at 17).

The ALJ also considered Wilson's testimony in view of certain factors set forth by the Commissioner. (*See* R. at 17). In that regard, the ALJ noted that, although Wilson denied doing much productive daily activity during the hearing, "this is at odds with previous statements that he made to Dr. Candela about being able to watch his children, doing limited chores, traveling independently and handling money." (R. at 17). Wilson had told treating clinicians during his incarceration period in March 2012 that he was compliant with medication, with good response, and no untoward side effects. (R. at 17). The ALJ noted that nothing from the record contradicted this. (R. at 17). The ALJ also noted that there was "little ongoing treatment, and no

inpatient hospitalizations or emergency room visits for any of his severe impairments." (R. at 17). The ALJ noted that Wilson reported being a special education student (and his attorney requested IQ testing, discussed *infra*), but that he was able to complete a GED in jail. (R. at 17).

From the two state-agency assessments (Dr. Trachtenberg, M.D. on September 20, 2012 and Dr. Eckardt on November 27, 2012), Wilson was deemed to have no more than a moderate degree of impairment in any mental-functioning related area—which the ALJ found consistent with the rest of the treating and examining evidence. (R. at 18).[18]

In view of the foregoing and the Court's review of the relevant portions of the record, the Court cannot find that substantial evidence did not support the ALJ's mental RFC determination and, furthermore, finds that it accounts for the limitations supported by objective evidence.

### iii. The ALJ's Hypothetical Questions to the VE

In relevant part, the hypothetical questions asked to the vocational expert in view of the ALJ's RFC determination are as follows[19]:

---

[18] Dr. Trachtenberg's mental RFC assessment "reveals some areas of moderate limitation," but that "[t]hese would not preclude employment." (*See* R. at 57-59). Dr. Eckardt's mental RFC assessment was the same. (*See* R. at 66-68). *See Chandler*, 667 F.3d at 361 ("State agent opinions merit significant consideration as well.").

[19] In this reproduction, the "Claimant" is Wilson, "Ms. Clark" is the vocational expert, and the questions are being asked by the ALJ. (*See* R. at 22-24, 41-44).

Q  Let me come up with a few hypotheticals for you.  For the first one I'll have you assume a hypothetical individual of the same age, education and work experience as the Claimant with the following residual functional capacity.  I'll have you assume that this individual should avoid concentrated exposure to, to irritants, fumes, dust, gases, poor ventilation.

And this individual would be limited to work involving unskilled tasks in a low-stress job, which I would define as having only occasional decision-making required and only occasional changes in the work setting with no fast-paced production or assembly line type work, Ms. Clark, and also only occasional interaction with the public and coworkers.

Given the limitations in this first hypothetical, would there be jobs in the local, regional or national economy that such a person could perform?

A  What exertional level, Judge?

Q  I don't have any exertional level right now.

A  Okay.  So, all exertional levels?

Q  Correct.

(*See* R. at 42-44).

"When posing a hypothetical question to a vocational expert, an ALJ may use a functional phrase to describe the consequences of claimant's limitations rather than describing the evidence of the limitation."  *Fazzolari v. Astrue*, No. 12-1309, 2014 WL 644725, at *8 (D.N.J. Feb. 18, 2014).  Here, first, the ALJ's hypothetical individual "should avoid concentrated exposure to irritants, fumes, dust, gases, [and] poor ventilation."  (R. at 42).  This accounts for and reflects Wilson's history of asthma and related findings, as discussed above.

Next, the ALJ's hypothetical individual "would be limited to work involving unskilled tasks, in a low-stress job, which I would define as having only occasional changes in the work setting, with no fast-paced production or assembly line-type work, Ms. Clark, and also only occasional interactions with the public and co-workers." (R. at 42). The Court has already determined above that substantial evidence supports the ALJ's mental RFC determination and accordingly rejects Wilson contention that, "[i]n regard to the RFC," there is no "evidentiary explanation" that Wilson is "capable of low stress unskilled tasks, sustaining concentration throughout the day with no periods of off-task attention lapses." (*See* D.E. No. 13 at 14-15). Indeed, Wilson's challenge regarding the ALJ's hypothetical appears directed to his moderate concentration, persistence and pace restrictions:

> Here, it is [Wilson's] assertion that the ALJ's construction of hypothetical questioning to the VE did not include all of [his] credibly established mental limitations. Here[,] because the ALJ failed to construct a hypothetical which reasonably conveyed the extent of [Wilson's] mental limitations, the VE's answer to those hypotheticals cannot constitute substantial evidence to support the ALJ's step five denial of benefits. This failure necessitates remand.

> In the instant case there is no articulated evidentiary rationale for the decisional RFC for unskilled low stress work without any concentration deficits or single off-task moment despite 'moderate' [concentration, persistence and pace] restrictions.

(*See id.* at 22-23 (internal quotation marks and citations omitted)). In other words, the Court can only decipher from Wilson's brief that the limitations that he claims were disregarded by the ALJ in his hypothetical submitted to the VE concern moderate difficulties in concentration, persistence, or pace.[20]

---

[20] *See Whitford v. Comm'r of Soc. Sec*, No. 13-5469, 2014 WL 3514990, at *8 (D.N.J. July 15, 2014) ("[I]f there are any other specific limitations to be included [in the hypothetical], the Plaintiff does not cite them.").

But the ALJ's hypothetical accounts for credibly established limitations regarding concentration (i.e., work involving unskilled tasks, in a low-stress job), as well as persistence and pace (i.e., no fast-paced production or assembly line-type work, and having only occasional changes in the work setting).[21]  Said differently, Wilson's difficulties with concentration, persistence, or pace are reflected by the hypothetical individual being limited to work involving unskilled tasks, in a low-stress job—with only occasional changes in the work setting, no fast-paced production or assembly line-type work, and only occasional interactions with the public and co-workers.  Such limitations address Wilson's difficulties by reducing distraction, reducing stress (which accounts for his anxious mood noted in the March 2012 mental status examination), allowing him to keep pace with unskilled work.   And the limitations of the hypothetical individual are consistent with Dr. Candela's mental-status examination findings that revealed (among other things) no formal thought disorder, as well as with Dr. Song's report showing that Wilson "presented with normal concentration and persistent memory, attention, and social interaction during the evaluation."  (R. at 415).

As set forth succinctly in another case: "This hypothetical includes all of the limitations which the ALJ ultimately determined afflicted [Wilson]. In fact, the hypothetical mirrors the ALJ's recitation of [Wilson's] residual functional capacity and, thus, represents the limitations the ALJ believed to be credible."  *See Palisay v. Comm'r of Soc. Sec.*, No. 11-4857, 2012 WL 3201428, at *17 (D.N.J. Aug. 2, 2012).  The Court therefore declines to find the ALJ erred at

---

[21]      *Cf. Holly v. Comm'r of Soc. Sec.*, 590 F. App'x 167, 169 (3d Cir. 2014) ("[The claimant's] insistence that the ALJ's hypothetical should have included a specific statement about impairments on concentration, persistence and pace is not persuasive. The evidence [the claimant] produced on mental impairments was generally very thin, particularly on disabling limits in persistence or pace. Therefore, she gives us no compelling reason why these should have been spelled out in detail in the hypothetical. On this record, the ALJ's residual functional capacity finding was accurate, comprehensive and supported by substantial evidence, and we are convinced that he gave the vocational expert enough information to provide a sound opinion about the types and numbers of jobs that were available."); *Ramirez*, 372 F.3d at 554-55 ("We are not satisfied that these limitations [in the hypothetical] take into account the ALJ's own observation . . .that [the claimant] *often* suffered from deficiencies in concentration, persistence, or pace.") (emphasis in original).

step five and finds the Commissioner has sustained its burden based on the responses of the vocational expert. *See Richardson v. Comm'r of Soc. Sec.*, No. 16-8279, 2017 WL 6550482, at *10 (D.N.J. Dec. 22, 2017) ("At the hearing, the ALJ asked the VE to consider a hypothetical individual with [the claimant's] age, education, vocational history, and RFC. The ALJ read the entire RFC to the VE. Since the RFC is supported by substantial evidence, the ALJ accurately portrayed [the claimant's] credibly established limitations to the VE. Therefore, the ALJ did not err at step five.") (internal citations omitted); *Fazzolari*, 2014 WL 644725, at *6 ("Testimony of a vocational expert constitutes substantial evidence for the purpose of judicial review when the hypothetical question encompasses all of a plaintiff's impairments which are supported by the medical record.") (citations omitted).[22]

### c. The ALJ's Denial of IQ Testing Does Not Warrant Remand

At the ALJ's hearing, Wilson moved for an order to have IQ testing done. (D.E. No. 13 at 10; *see also* R. at 27). The ALJ deferred on this request, ultimately denying it as part of his decision. (R. at 10, 27). On appeal, Wilson argues that this was improper, necessitating a remand. (*See* D.E. No. 13 at 10-13, 15, 26). In particular, Wilson avers that Listing 12.05 would be met, rendering him disabled. (*See id.* at 10-11, 26).

At first blush, Wilson's contention seems compelling. After all, the ALJ found that Wilson has a history of learning disability, with borderline to low-average intellectual disability. (R. at 12-13). Indeed, Dr. Candela's mental-status examination report states that Wilson "is

---

[22]    To be sure, regarding the VE's testimony, Wilson appears to argue that the ALJ failed to consider certain testimony purportedly showing that Wilson could not do the three jobs the expert found he could do. (*See* D.E. No. 13 at 15; *see also* R. at 45-49). More specifically, it appears that Wilson's counsel asked a series of questions to the vocational expert whereby, as examples, the "hypothetical individual was 10 percent off task on a consistent basis daily" and the hypothetical individual was "absent . . . twice a month." (*See* R. at 45-49). But Wilson fails to develop his contention on appeal and provide a basis in law or fact as to how or why such limitations are relevant to Wilson and necessary to hypothetical questioning to the VE—and, moreover, why the answers gleaned from such questions must be considered. (*See* D.E. No. 13 at 15).

functioning on the Borderline to Low Average Level of Intellectual Ability." (R. at 418-19). And Wilson posits on appeal that "it is certain that if [his] borderline IQ was 70 or below he would be found presumptively disabled pursuant to the Commissioner's listing at 12.05C" and "a 70 IQ presumptively disables [him,] while a 71 arguably does not." (D.E. No. 13 at 10, 13). Wilson seems to note the particular significance of his request given that "the Commissioner lost [his] school records, IQ tests and psychiatric files." (*Id.* at 10).

"ALJs have a duty to develop a full and fair record in social security cases." *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995). But the "burden lies with the claimant to develop the record regarding his or her disability because the claimant is in a better position to provide information about his or her own medical condition." *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004) (citations omitted). "The ALJ's only duty in this respect is to ensure that the claimant's complete medical history is developed on the record before finding that the claimant is not disabled." *Id.* (citations omitted). Therefore, "[a]lthough the duty to assist the claimant and develop the record is well established, the duty is not unlimited and does not come into play where there was sufficient evidence in the record for the ALJ to make his decision." *Jenkins v. Berryhill*, No. 17-0211, 2017 WL 4012607, at *10 (M.D. Pa. Sept. 12, 2017) (internal citations omitted). Further, if a claimant "was represented by counsel at the administrative level, the ALJ is entitled to assume that the claimant is making the strongest case possible for benefits." *Houseknecht v. Berryhill*, No. 16-1703, 2017 WL 3911067, at *7 (M.D. Pa. Aug. 4, 2017) (also stating "the ALJ's duty is to ensure that the evidence is sufficient to make a benefit determination and to resolve any material conflicts or ambiguities in the evidence"). In fact, the Third Circuit has stated that an ALJ's duty to develop a full and fair record "is most acute where the claimant is unrepresented." *Turby v. Barnhart*, 54 F. App'x 118, 122 (3d Cir. 2002).

It is simply unclear why Wilson failed to have IQ testing performed and included the results in the record for the ALJ to consider at the hearing if this information was so important. This would appear to align with Wilson's burden to develop the record regarding his alleged disability. After all, Wilson is presumed to be in a better position to provide information about his own medical condition. And it is undisputed that Wilson was represented by counsel—who is presumed to make the strongest case possible for benefits.

But even accepting that the ALJ erred, Wilson fails to convince that the Court how Listing 12.05 could be met for another reason. Based on the phrasing used at the time the ALJ's decision was rendered, Listing 12.05 requirements are as follows:

> Mental retardation refers to significantly subaverage general intellectual functioning **with deficits in adaptive functioning initially manifested during the developmental period**; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> OR
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
>   1. Marked restriction of activities of daily living; or
>   2. Marked difficulties in maintaining social functioning; or
>   3. Marked difficulties in maintaining concentration, persistence, or pace; or
>   4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.05C, 12.05D (emphasis added).[23]  The

problem for Wilson is the adaptive-functioning portion of Listing 12.05.  "In order to meet or

equal listing 12.05, a claimant must prove that she experiences 'deficits in adaptive functioning'

with an onset prior to the age of 22."  *Gist v. Barnhart*, 67 F. App'x 78, 81 (3d Cir. 2003) ("As is

true in regard to any 12.05 listing, before demonstrating the specific requirements of Listing

12.05C, a claimant must show proof of a 'deficit in adaptive functioning' with an initial onset

prior to age 22.").[24]  In fact, Wilson's appeal brief says as much in bold typeface.  (*See* D.E. No.

13 at 11).

But, as the Commissioner suggests (*see* D.E. No. 14 at 22), Wilson advances no

argument and cites nothing from the record that he had deficits in adaptive functioning before

age 22.  Nor does Wilson argue that the ALJ failed to provide an analysis that deprives the Court

of meaningfully reviewing an adaptive-functioning determination.  To be sure, pursuant to this

District's Local Civil Rule 9.1(e)(3), Wilson could have filed a reply brief addressing this issue,

but he didn't.  And it bears worth repeating that he bears the burden of proof at step three—

which is the only step at issue relating to his IQ test according to Wilson's brief.  (*See* D.E. No.

13 at 10, 23, 26).  The Court therefore declines to find remand is warranted.  *Cf. Money*, 91 F.

App'x at 216 ("Although [the claimant] might want the additional evidence she mentioned and it

might help the ALJ make an even more informed decision, such evidence was not necessary. The

district court correctly denied [the claimant's] request for remand on this basis.").

---

[23]     Wilson only appears to advance an argument relating to 12.05C (see D.E. No. 13 at 10-12), but the
Commissioner also addresses 12.05D.  So too will the Court.

[24]     *See also Cortes v. Comm'r of Soc. Sec.*, 255 F. App'x 646, 651 (3d Cir. 2007) ("The Commissioner's
regulations set forth two requirements for a showing of mental retardation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §
12.05. First, a claimant must prove 'subaverage general intellectual functioning with deficits in adaptive
functioning' manifesting before age 22. *Id.* Second, the claimant must show that any one of four criteria satisfies the
required severity.").

## V.    Conclusion

For the foregoing reasons, the Court AFFIRMS the Commissioner's decision. An appropriate Order accompanies this Memorandum Opinion.

_s/ Esther Salas_____
**Esther Salas, U.S.D.J.**